Mr. Rentea. May it please the Court and good morning, Bogdan Rentea representing the appellants. I've also prepared for this oral argument a notebook. They're all from the record, obviously. It's easier when you talk about a contract to look at the language than to hear somebody just read it out loud. So I hope you each receive a copy of the book because I'm going to be referring to it. This case turns mainly on the issue of contract interpretation, two separate contracts. The reason that I say mainly is because if you happen to disagree with me, I hope you don't, but you happen to disagree with me as to how the contract should be interpreted and you agree with the holding of the district court, then there was a trial on the damages and we believe that some errors were committed in the trial by the admission of certain type of evidence which led to a $3 million judgment that we don't think is supported by the evidence. So let me return to the contracts. There are two separate contracts. We don't contend that they're ambiguous. We contend that they are really clear, they speak for themselves. But what I want to do in my time is to address some of the nuances that may not be readily apparent to somebody that hasn't lived with this case for a long time and we all do. So, and I hope that once I point those nuances out to you, that you will agree with our position that the district court erred when it granted summary judgment and held as a matter of fact and law that my client breached the agreement and is liable for repayment of certain commissions. So here are the two contracts. The first contract is between Wealthmark, my client, and Phoenix Insurance Company. Okay. That's a distributor agreement. It gives my client the right to sell their products and it obligates them to pay us commissions. Under certain very specific situations, the commissions which are paid can be demanded to be returned and I'll get to that in just a second. The second contract, and I'm really going to say it's a two-part contract, is known as the Assurance of Discontinuance Agreement that was entered into not by my client but by Phoenix and the State of Minnesota. The State of Minnesota investigated certain practices of an agent that was a, in the chain of distribution that my client was on top of. And that assurance of discontinuance generated a couple hundred separate contracts which were in turn entered into between Phoenix and policyholders. Okay. We had nothing to do with those agreements but were bound by the decisions that were made through those agreements. So let me turn to the distributor agreement first. And tab number one is the excerpt from the agreement that simply lays out the obligations of Wealthmark as a distributor to repay commissions under certain circumstances. I don't think there's any disagreement among the parties and I think, not I think, the court also so found that the repayment obligation is not absolute. As it states, repayment of commissions except as otherwise provided in a compensation schedule and then it goes on from there. In the event of a chargeback of commissions, any compensation paid by Phoenix must be paid back. So what, I'll get to the compensation schedule in just a second. But again, there's an obligation and you know this and I'm sometimes stating the obvious but you sell a policy, premiums are paid, the agents earn commissions under certain circumstances, if, well, if Phoenix has to return those commissions or ends up returning those commissions, then under this provision subject to the compensation schedule, the agent must return his or her commissions. Phoenix gives the money back, you give your commissions back. The compensation, the provision that this, that this repayment obligation is subject to is found in the compensation schedule which is in tab number two and specifically, the compensation schedule has a notable footnote, E like an elephant. And that footnote states, a 100% chargeback will occur upon a full or partial surrender of the contract within six months of issue. A 50% chargeback will occur upon a full or partial surrender of the contract in months seven to 12. We don't need to reach this decision yet but a fair reading number one is that if there is a surrender after 12 months, then no commissions have to be paid back. So in the first six months, if there's a surrender, you pay back 100% of your commissions and if there's a surrender in months seven to 12, you pay back 50% and if there's a surrender after 12 months from the date of issue of the policy, you pay back nothing. But suffice it to say that if there's a surrender, there's not a 100% payback of commissions. Now, here's what's interesting with this language as compared to, and I'll go back to what's in the actual contract. This schedule that was prepared separate from but made a part of the contract simply uses the word full or partial surrender. It does not further define it and it doesn't, for example, say that how the surrender comes about specifically. It doesn't have to be an actual surrender by the policyholder. It doesn't have to be a surrender by the policyholder in accordance with the surrender provisions of the contract. All it says is surrender. Why is that significant? If you go back to tab number one in the repayment of commission section, surrender is defined as one of the instances in which repayment of commissions is required. And here's the language they use. And I apologize. If you look, we boxed this thing out, but the repayment of commissions starts on the left-hand side and continues on the right-hand side. And they didn't call out what I'm about to read to you. And I apologize that it's so microscopic, but that's how these contracts sometimes copy. Commissions must be repaid, number two, if a Phoenix product sold by a distributor is lapsed, surrendered, canceled, or otherwise terminated by the contract holder by exercising a right given the contract holder by the terms of any provisions or rider up to the Phoenix product. Mr. Grantia, I don't want to interrupt the flow of your thought, but you've only got six minutes left. So you need to go precisely to where you think the magistrate judge and district judge erred in this contract interpretation. Thank you. What's significant with this language is in the contract, which is qualified by the schedule, is that Phoenix used a very precise definition of the circumstances under which commissions have to be paid back. It's got to be an act by the policyholder pursuant to provisions in a contract. That same language was not carried forward in tab number two in the schedule, in footnote E. It doesn't say upon a full or partial surrender by the policyholder according to the terms of the contract. It left it just the word surrender. So I'm going to get to the punchline. So Phoenix and the state of Minnesota entered into a deal to give relief to 200 plus policyholders, which ended giving relief to 200 plus policyholders. And part of the deal was if relief is going to be given, then the policyholder and Phoenix must enter into a separate agreement. That's tab number three. Okay. And here's what tab number three says. And this is language that Phoenix agreed to and a customer agreed to. Upon receipt of settlement agreement and the release, and in consideration, blah, blah, blah, Phoenix will rescind policy X, which will be deemed surrendered, terminated, null, void, and without force and effect. So they claim that the reason for that, for they could have said we'll rescind the policy, which will be considered terminated, null, void, no further force and effect, all rights are terminated, it's over. They put in the words, will be deemed surrendered. And the explanation for that is they wanted to make sure that the policyholder understood that once he or she accepted this, they had no further rights under the policy and couldn't also surrender it and get the cash value. Well, they chose to classify this deal as being a rescission, a termination, a cancellation, a nullity, and a surrender. It was a rescission, was it not, legally speaking? I'm not going to disagree that it was also a rescission, but it was classified as all of these things. But the only two things that matter, it was classified as a rescission and it was classified as a surrender. Phoenix wanted that language in there because it served a purpose for them. We need this language that this contract was deemed surrendered because it benefits us. Nobody objected. We weren't there. We didn't object. Nobody, the state of Minnesota said it's fine. Customers said it's fine. So now, we take this language and we say, as applied, not between the customer and Phoenix. We're not here representing customers saying it was not a rescission, it was really a surrender, we want more. As between Phoenix and Wealthmark, words have meanings. You deemed it a surrender and now when we point out footnote E that says, upon a surrender, not actively by a policyholder, but a surrender defined very liberally to include this kind of a situation. You can't charge us the $3 million that you now claim that you paid us and we want back. I don't have time to even get into the other issues, so I'm going to stop. And then come back on rebuttal because I'm sure they'll cover all the issues. We have your full briefing and we appreciate that give back. And you have time for rebuttal. Thank you. All righty, Mr. Chambers. Thank you, Your Honor. May it please the court. The contract between Wealthmark and Phoenix creates a pretty standard commission arrangement. If Wealthmark or one of its representatives sells a Phoenix product, then Wealthmark earns a commission and Phoenix gets the premium. If we get paid, you get paid. If for any reason the sale falls through and the premium has to be returned by Phoenix, Wealthmark has to repay its commissions. If we don't get paid, you don't get paid. This is how commissions work. Now, there's no factual dispute about what happened here. The Minnesota Attorney General expressed concerns over the way a Wealthmark representative named Tony French who sold a number of Phoenix annuities. In response to those concerns, Phoenix rescinded 222 annuities and refunded the premiums that were paid. What did he do wrong? Your Honor, the Minnesota Attorney General believed that he failed to properly explain the features of these policies to the purchasers and it resulted in some unsuitable sales under potentially misleading circumstances. Under the settlement agreement between the Minnesota Attorney General and Phoenix, the assurance of discontinuance, there was no finding of fault. It was kind of resolved short of that. But it was basically a failure to properly explain the policies is what was alleged. But Phoenix addressed that concern by rescinding all the annuities. The district court correctly held that under these circumstances, the commissions have to be repaid under the distributor agreement between Phoenix and Wealthmark. Now, to argue otherwise, Wealthmark makes two main errors. First, it ignores the fact that the distributor agreement confined to its four corners provides no basis for keeping these premiums. So looking at that contract by itself, which they've agreed is unambiguous, these commissions have to be repaid. So what do you do with the word surrender? The word surrendered in the distributor agreement? Right. In footnote E of the distributor agreement, the word surrender is clearly referring to a specific policy feature. Mr. Rentea has asked you to give it the broadest possible interpretation, but he doesn't offer any authority suggesting the court should take that approach. Instead, the cases he cites and the cases we cite say that a contract has to be construed as a whole in every term given effect. If you look at footnote E, it only applies to three of the five products listed in the compensation schedule. And the reason for that is because different annuities have different surrender terms. The Phoenix Edge product, for example, does not permit Wealthmark to keep premiums under any circumstances, even if there is a surrender. This is because a general rule won't apply to all commissions. So footnote E applies to a certain feature of certain products. How do we know that here? Your Honor, the context of it only applying to three, but also, as Mr. Rentea pointed out, if you go to the repayment of commissions paragraph, subparagraph two uses the word surrender to refer to a specific right given to the contract holder by the terms of a Phoenix product. Is that in this booklet here? Have you seen the booklet? Yes, Your Honor. I don't know what page of the booklet it's on. It's actually the part that Mr. Rentea pointed out that is not broken out in that first exhibit. So if you go to subparagraph two of that, you'll see that the contract uses the term surrender specifically to refer to a right that can be exercised by the annuity holder under the contract. It's not a broad term for surrender. It's referring to a specific policy feature. And if you look at these policies or these annuities, the term surrender, and they're on pages 565 and 570 of the record where the relevant provisions are, you'll see that surrender is defined as a request to withdraw the entire accumulation value of the annuity. And that's subject to certain charges, a surrender charge. In some cases, there's a bonus recapture charge. There's other adjustments that will be made pursuant to the policy, and there's taxes that can come out. It's important that no one contends that's what happens here. With these annuities, no annuity holder requested the accumulation value. Phoenix did not pay the accumulation value. There were no surrender charges imposed. In fact, if you look at the assurance of discontinuance, Phoenix was prohibited from imposing surrender charges. There were no adjustments made. In other words, these simply were not the surrenders that are contemplated under footnote E of the compensation schedule. What they were, however, is they were a return of premiums. If you look at subparagraph 1 of the repayment of commissions clause, it says that should Phoenix for any reason return or refund any amount of any premium payment made on a Phoenix product, Wealthmark has to repay the commissions. It's undisputed that that's what happened here. As Your Honor pointed out, as a matter of law and as the district court held as a matter of fact on page 776 of the record, these were rescissions. They were not surrenders. These are precisely the circumstances under which subparagraph 1 of the repayment of commissions clause requires Wealthmark to repay its commissions. Now, to argue otherwise, Wealthmark doesn't rely on anything in the distributor agreement. It points to the assurance of discontinuance that was signed five years later. There's a preliminary problem with that approach that hasn't been addressed. Even if you accept the idea that the court should be looking outside the four corners of the distributor agreement to see what the word surrender means, Wealthmark has not given any reason to look to the assurance of discontinuance to inform that interpretation. The assurance of discontinuance was signed five years later. It's appropriate in some circumstances to look at the circumstances of the execution of a contract to inform the meaning of its terms, but the assurance of discontinuance was not a circumstance that existed at the time the distributor agreement was executed. None of the parties to the distributor agreement, not Phoenix, not Wealthmark, could have known that the assurance of discontinuance would happen. There's no reason to think that that contract reflects their intent when they use the word surrender in footnote E. But even setting that aside, if you look at the text of the assurance of discontinuance itself, you'll see that these were rescissions. They were not surrenders. The body of that document uses the term rescind, or some variation thereof, at least a dozen times to refer to the relief that Phoenix would offer. It's completely consistent in the body of the document, and there's other places where it refers to the offer with a capital O, which is defined to include the rescission offer, so dozens of instances referring to rescissions. Never once does the body of that document say that Phoenix will surrender the policies. And this makes sense. The annuity holders already had a surrender right under the annuities. There was no need for the attorney general to go to bat, and there was no need for Phoenix to enter into a separate contract to give them that right. Any one of these annuity holders, without any action from the attorney general or Phoenix, had a right to surrender their policies. A separate contract was required to give them the rescission right that was contemplated in the assurance of discontinuance. Now, even if you ignore the body of that document and look at the sentence Mr. Rentea quotes, as Mr. Rentea has pointed out, that contract, that sentence starts by saying Phoenix will rescind the annuity. Only after it says that does it go on to say the annuity will be deemed surrender, terminated, null, void, and without force and effect. In context, it's clear what that was doing, and I think Mr. Rentea has alluded to it. Exhibit E is the release agreement that an annuity holder would sign if it accepted Phoenix's offer for rescission. The annuity holder is not a sophisticated consumer, and they likely are not represented by counsel in this transaction. They got a letter from the attorney general saying you have this right, and they accepted an offer. As a result, they won't necessarily know what rescind means if that term is used by itself. This explanatory language is there to make sure the annuity holder knows that if it accepts this offer, that's the end of their rights under the contract. It's done. It's canceled. It's terminated. It's null, and it's void. And the district court pointed out there's a good reason the word surrender has to be used in this sentence. Under the annuities, the annuity holders all have a surrender right that allows them to withdraw the entire accumulation value of the policy. If this sentence didn't say deemed surrendered, an annuity holder could easily understand that they wouldn't be getting any future annuity payments but not understand that they're also giving up the right to withdraw the accumulation value. So deemed surrendered lets the annuity holder know. Let's be realistic here, though. If you're talking about the unsophisticated consumer, they've canceled the policy. They give him back all the money that he paid to go into the annuity. They've given him back the interest. Surrender is at least perfluous unless you meant something specific by it. Well, surrender is there to make sure the annuity holder knows that once they get their premiums back, they don't also get the accumulation value. The premiums and the accumulation value are different amounts, and they can be drastically different. Well, it's more like the interest in the accumulation value. Well, the interest wasn't actually provided for under these annuities. The interest was an extra. I know. It was paid pursuant to the rescission. Yes, the assurance of discontinuance. Yes, Your Honor. So, I mean, I think in a legal sense, deemed surrendered really does just kind of describe the effect of rescission, but it was just important to make sure the annuity holder understood what that meant. But even if you just look at the word deemed surrendered by themselves in isolation, you still have to give some effect to the word deemed. Now, the way Wealthmark interprets the phrase deemed surrendered, it means deemed surrendered for all purposes in relation to all individuals, including parties who aren't a party to this agreement or mentioned in it. That's just a surrender. According to Wealthmark, deemed surrendered just means surrendered. But the district court recognized it has to give effect to every term. So in order to give effect to deemed surrendered, you have to answer the question, deemed surrendered for what purpose? And here again, the context of the agreement answers that question. It's deemed surrendered as between Phoenix and the annuity holder who are signing this release agreement. It is not deemed surrendered as between Phoenix and other parties. And we know that's the case because in paragraph 11 of the assurance of discontinuance, Wealthmark and the Attorney General expressly say the assurance does not, quote, Wealthmark is a person outside the scope of the assurance. Wealthmark commissions are a matter outside the scope of the assurance. The assurance itself makes clear that it is not altering the rights of non-parties. And again, this makes sense. As Wealthmark points out, it wasn't at the table. Phoenix couldn't unilaterally change its rights in this way if it wanted to, and that's very clear if you imagine the reverse. If you imagine a transaction by which Phoenix allowed the annuity holders to surrender the policies, which would mean that Wealthmark gets to keep its commissions, but then in the release agreement, Phoenix said that the surrendered annuities would be deemed rescinded, then Wealthmark would clearly say that that could not affect their right to keep the commissions. It doesn't matter what the transaction was deemed as between the annuity holder and Phoenix. What matters is what happened. And again, it's undisputed. This was a rescission, and premiums were returned. Thus, whether you look at the distributor agreement confined to its four corners, as you should, since that document is unambiguous, or if you construe that document in conjunction with a separate contract with separate individuals signed five years later, the answer is the same. Wealthmark has to repay these commissions. If we don't get paid, you don't get paid. Now, that's all I have to say on that issue. On the economic loss rule, I'll just stand on the brief. On the best evidence rule, I'll mostly stand on the brief, but I'll also point out that the comment to Rule 1002 addresses this exact scenario. The comment explains that the best evidence rule only applies when you're trying to prove the contents of a writing. It does not apply when you're trying to prove an event, even if the event is reflected by writing. The example that gives it that is this case. It says, quote, for example, payment may be proved without producing the written receipt which was given. That's what Phoenix is trying to prove here, and that's the objection Wealthmark is making. Phoenix was only trying to prove the event of the payment, that the commission payments were made. It wasn't trying to prove the contents of those writings. As a result, the district court properly admitted Phoenix's evidence of the payment, which was testimony from its witness and a summary of its internal payment records. And acting as a trier of fact, the district court properly credited that evidence and found that the commissions were, in fact, paid. Unless the court has any further questions, I'll simply ask that the district court's judgment be affirmed, and I'll waive the remainder of my time. Thank you. Thank you. Mr. Ventilla. Thank you. What matters is what happened. I agree with that. And I also agree with the fact that Wealthmark, no agent, is ever a party to the contract that is issued between an insurance company and the insurer. So all we have control over is after something happens to that contract, which you, Phoenix, claims triggers a repayment obligation, I have the right to say, so what happened? Well, they were rescinded. I guess I've got to pay back the commissions. Anything else happen that I should know of? Well, we also deemed them surrendered. Really? Well, if you deemed them surrendered, then you just activated footnote E. I guess I don't owe you any money. You chose to characterize the transaction as a surrender. Are you a third-party beneficiary of that agreement? You know, Your Honor, I kind of started researching that, and I kind of hit a dead end on that. That's because, as you said, your client was never a party to that. Because it was not intended for my benefit. Correct. But you are stuck with the deal you made. And I'm not sure who said it, but I think you're correct. There was – if you wanted to – maybe I said it. If you really wanted to cut off the rights of an unsophisticated consumer, just say, and all rights are terminated. Any and all rights under the contract are terminated, null, void, of no further force and effect. Wait a second. They used all those terms. They used every one of those terms. And then they slipped in deemed surrendered. Okay, you're stuck with that. I mean, we're watching ad nauseam. For some it's ad nauseam, and for some it's interesting, all these impeachment hearings. Words have meanings. You use those words, you're stuck with them. You may be sorry you used those words, but you used them. Here they used the words, they classified the transaction as a surrender. It activates footnote E. Trial time. Obviously I disagree with the best evidence rule not being applicable. Nancy Turner, their representative, clearly stated in response to my specific questions. So how do you pay commissions? Check and electronic fund transfer, EFTs. Great. Do you keep copies of those? Absolutely we keep copies of those. Great. So what are you showing me here? Well, this is, and this is D4 and 5 in your book. Well, what I'm showing you here is a summary that I prepared from commission runs, which are literally hundreds and hundreds and hundreds of pages. Great. I don't have a problem with the fact that this is a correct summary of those commission reports. The commission reports that Phoenix runs show commissions earned. Okay. Great. So you give me all these numbers and then go to the last page of, either of them will do, but D, I mean, tab 4, it's exhibit D10. Comp paid. $2.2 million, charged back $2.1 million. Whoa, whoa, whoa, whoa. You kind of jumped a little bit. I get that a lot of commissions were earned and you got these big voluminous documents that show it. I get that you boiled down those documents in a summary. I get that. And now when did you get to actually paid $2.2 million? I mean, they got cents, .39 cents. This is very accurate. So the best evidence is not this summary or the testimony of the witness, but the actual checks and EFTs, which they keep copies of. Now, I said this in my brief. I'm going to say it in the next six seconds. You may say, well, Mark knows what they got paid. Come on. But French, you have no clue that he got paid $2 million. And you're trying to impose a $2 million judgment on me by not giving me checks and evidence of EFTs, but by giving me a summary of a document that shows commissions are earned. Thank you. Thank you. We have your arguments. Next case of the morning is number 1820576, North Cypress Medical Center v. Sigma.